UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-CR-23 (KMM/LIB)

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S MEMORANDUM** |
| v. | ) | **IN SUPPORT OF HER MOTIONS** |
| | ) | **TO DISMISS AND SUPPRESS** |
| Trina Mae Johnson, | ) | |
| | ) | |
| Defendant. | ) | |

Ms. Johnson challenges the doctrine that the Red Lake Tribal Court represents a sovereign entity. The FBI and Red Lake police investigated Ms. Johnson in concert. Their knowledge and strategies were by case law imputed onto one another, the overlap overwhelming. From initial awareness of the offense, and in the F.B.I.'s consultation with the United States Attorney's office, the government's intent from May 2, 2022, was to secure an indictment. The two cases – tribal and federal – were never going to be distinct.

We begin with the combined investigation, then reach the Tribal Court proceedings, then the merits of our motions.

**The initial investigation and interview, and the arrest and searches**

On May 2, 2022, F.B.I. Special Agent Ryan Nilson received notice of the alleged crime. T. 105. The child had been brought to the Evergreen shelter, and a mandatory report of child abuse had been filed. T. 80. He had been starved, and

"had a lot of wounds, burns as well." T. 82. Given the photographs alone, Agent Nilson determined the crime was, in his words, "terribly serious, yes. Yeah." T. 81. A major crime had occurred on the Red Lake Indian Reservation. Q. "By any definition?" A. "Yes." T. 81. At Agent Nilson's suggestion, the child was brought to Sanford Medical Center for an evaluation, where two other agents were present. T. 81.

To further involve the FBI in the investigation, Agent Nilson consulted with the "Behavioral Analysis Unit in Quantico." T. 84. The unit provided investigative strategies, and set out the elements of torture, a <u>federal</u> offense. Agent Nilson was also provided a checklist from the "Child Accountability Commission." T. 85. Officials at Quantico provided an article, "Child Torture as a Form of Child Abuse," T. 85, which was forwarded to the United States Attorney's office. T. 85. Hence early on, the D.O.J. was made aware of Ms. Johnson's investigation, and the Agent's preference for charges to follow. On cross: "You've been at this eight years. If this doesn't go federal, nothing goes federal. Fair enough? Am I exaggerating or not?" A. "I wouldn't say you're exaggerating . . ." T. 86.

Agent Nilson identified Trina Johnson as the child's assailant. T. 105, 107.When Ms. Johnson was summoned for an interview, on May 3rd, her arrest was imminent. Agent Nilson noted, "There's a lot of probable cause there for sure." T.

88.

During the interview at the FBI station, Agent Nilson was in contact with AUSA Laura Provinzino. T. 92. At the conclusion, Agent Nilson didn't allow Ms. Johnson to leave, as promised, but instead personally drove Ms. Johnson to her home on the Red Lake Reservation, restricting her freedom. Once at the house, he secured consent to search, whereupon she was arrested by Red Lake Tribal Authorities. Agent Nilson agreed with her cuffing. "There was probable cause for an arrest, absolutely." T. 94.

Ms. Johnson was transported by the Tribal police to the Red Lake Jail. T. 94. There to await Tribal charges, not to be filed until the 6th.

By May 4th, Agent Nilson had consulted anew with AUSA Provinzino, T. 95, receiving no indication that there would be declined for prosecution. T. 96.

On May 5th, Agent Nilson interviewed Ms. Johnson yet again, this before she would be presented to the Red Lake Tribal Court, and be assigned an advocate. T. 94. Agent Nilson arrived at the jail with Red Lake Investigator Richardson in tow. T. 72. He announced to Ms. Johnson, "these rez dogs all around your house get treated better than [the child]. T. 97. What he said to her he meant, T. 97, adding, "I have never seen anything like this in my career." T. 98. He well knew the prison time Ms. Johnson faced was beyond what could be imposed by the Tribal Court. T.

97. And that's why he asked Ms. Johnson if she thought "five years . . . would be fair?" for what she had done. T. 97.

He told Ms. Johnson she could try to "explain to a judge or potentially a jury that for some reason you should only spend five years of your life in jail for what you did." T. 98.

He told her "we have a bunch of attorneys that sit out in the city at the U.S. Attorney's Office." They're the ones that are going to go to court and present the case and the person in the robe which is the judge." T. 100.

The cross, his answers.

Q. "There's no question but that Trina was going to be indicted?

A. "Yes, that's what – that's what the investigation was about."

Q. "She's the lead defendant?"

A. "She is." T. 101.

Which is why he told Ms. Johnson, in the jail, "I just don't think it's a tribal matter at this point <u>because of the tribal system</u>." T. 102 (emphasis added).

**The Red Lake Tribal Court Proceedings**

Agent Nilson kept track of Ms. Johnson's tribal court proceedings, T. 78-79. Ms. Johnson's advocate, Clayton Van Wert, testified as to what occurred next. How the discouraging Tribal Court process was delayed, and delayed, and delayed

yet again. Until, of course, the United States indicted. There was never going to be a Red Lake Trial for Ms. Johnson.

Mr. Van Wert graduated from Bemidji State University, in 1989. His life experience is significant. He was a licensed police officer, Post Board certified, and in that capacity worked for the Beltrami County Sheriff as a jailor and field deputy. T. 21. He taught law enforcement classes at both the Hibbing Community College and the Leech Lake Tribal College. T. 21.

Mr. Van Wert has been a Red Lake Tribal lawyer for 2.5 years. T. 22. The process to become a "lawyer" he described as "simplistic," for "all you have to do is make an application and pay the fees. They do some vetting," and a B.C.A. background check. T. 22. Approval by the Red Lake Tribal Council is required. T. 22. There is no need to attend law school, however. Or pass the bar. T. 23.

Mr. Van Wert reviewed the Red Lake Tribal Court record with respect to Ms. Johnson's case, Exh. 11, and made the following observations.

Charges against Ms. Johnson were filed on May 6, 2022, based upon the same facts alleged in Ms. Johnson's indictment – assault and torture. T. 25. The investigative summary, attached to the charge, indicated that Special Agent Ryan Nilson had been notified by Tribal authorities, and was aware the child was taken to the Sanford Medical Center for an evaluation. T. 26. The F.B.I. had requested of

the Red Lake Investigator Richardson that the victim submit to a "FI", denoting a forensic interview. T. 26-27.

Ms. Johnson appeared in Red Lake Tribal Court on May 6, 2022, where she was detained without bail "until further order of the court." T. 27. A Red Lake Public Defender was assigned the case, and her case was delayed to June 7, 2022. T. 28.

Ms. Johnson's motion for bail was filed May 22, 2022, and summarily denied.

On May 26, 2022, Ms. Johnson's case was continued to July 7, 2022, with no change in her bail status, i.e., there was no bail whatsoever.

Mr. Van Wert filed his Certificate of Representation on July 14, 2022, T. 30, and moved for his client's release on bail again. Ms. Johnson had cancer treatment while incarcerated. T. 30. Attached to the motion is a memorandum authored by Danielle Nelson, "Programs Coordinator/Trainer" for the "Red Lake Criminal Justice Complex Detention Services." She worked in the jail. Ms. Nelson summarized Ms. Johnson's bi-weekly cancer treatments at the Sanford clinic in Bemidji, radiation to follow. Basic transportation issues to and from the clinic were a "concern" given "the short amount of staff we have available for transports." Ms. Nelson interjected a personal plea for release. "I strongly encourage you to reconsider allowing her a medical furlough, as other complications can and may

arise during her treatment." T. 31. She suggested the medical staffing at the jail was not sufficient to address Ms. Johnson's round the clock needs. Ms. Johnson's medical records, confirming her diagnosis were also attached to Mr. Van Wert's motion.

Mr. Van Wert testified that the Red Lake Jail "had gone through several practical nurses and registered nurses and PAs to attempt to make some sort of medical needs met at the detention center; but because of the conditions inside the jail, the medical staff refused to work." T. 33. Whether there was a pause in the radiation treatment, from July 21 to mid October, 2022, Mr. Van Wert had ongoing concerns. T. 46.

The Red Lake Court summarily denied this motion for release/bail. T. 30.

Another motion for her release was filed on August 11, 2022, and denied.

Another motion for release was filed on September 13, 2022, and denied. T. 31.

Finally, on October 19, at a pretrial, Ms. Johnson was released.

Compare, this Court will, Ms. Johnson's release in this case with no case bail required. She was sent home under the standard conditions. Docket Entries 18 and 23.

Mr. Van Wert was conversant with the Indian Civil Rights Act, 25 U.S.C.

1302. T. 33. He observed that Ms. Johnson was denied her guaranteed right to a speedy trial under that statute. T. 33. "Every time I asked for an expedited hearing for a trial, it was denied." T. 34.

Under the Act, Ms. Johnson could never be detained for reason of "excessive bail," yet no bail was ever set for 169 days. T. 34.

She had a concomitant right to due process, to be aware of the facts underlying the charges against her, but Mr. Van Wert received no investigative materials from the FBI, including Ms. Johnson's two very long interviews, Exhs. 2 and 7, nor the medical records of the child, nor the statements obtained by her co-defendants in this case. Mr. Van Wert never got copies of the search warrants signed and offered at this hearing. T. 34-35; Exhs. 9 and 10.

On Ms. Johnson's behalf, Mr. Van Wert "had repeatedly requested" the discovery from the prosecution, and had received nothing. In the Red Lake Tribal Court, the investigative materials are "only afforded to the defense counsel seven days before trial," he said. And "there would be absolutely no way that a one week period would be enough time to muster a very good defense with that amount of information that was, that I knew would be forthcoming." T. 35

He was aware of the FBI continued involvement, during a conversation with Ogema Neadeau, the tribal prosecutor. Mr. Van Wert became aware "that the FBI

was the primary focus of the investigation they were conducting." T. 36.

With respect to the entire process and Ms. Johnson's combined deprivation of due process, the prolonged continuances, lack of bail, and no discovery, Mr. Van Wert was asked, Q. "Did you voice these objections as you've articulated them today?" A. "Yes." Q. "Was there ever a favorable response to those objections?" A. "No." T. 37-38.

The last entry of Exh. 11 indicates a pretrial was set for January 31, 2023. By then Ms. Johnson had been indicted on January 25, 2022. T. 40, 79; Docket Entry 1.

**Motion to Dismiss**

For years, this Court has taken a hands-off approach to what occurs in the Red Lake Tribal Court. See e.g., United States v. Stately, 19-CR-342 (ECT/LIB), Opinion and Order, at p. 8, Docket Entry 161. The rulings have been that since the Red Lake Tribe is a sovereign, our Federal Court will not intrude upon the workings of its Court system. There has also been observation that local and federal authorities of course investigate cases together as a matter of typical and routine cooperation. United States v. Lussier, 21-CR-145 (PAM/LIB), Report and Recommendation, at p. 24, Docket Entry 92.

This Court was following the Supreme Court's deferential jurisprudence. In

our setting, though, there are no distinct privileges that Ms. Johnson had by virtue of her Tribal membership. Those distinct privileges which were supposed to result in her "special treatment" required by her Tribal membership. Morton v. Mancari, 417 U.S. 535, 554-555 (1974). The "inherent sovereign authority," of her tribe, Michigan v. Bay Mills Indian Cmty, 572 U.S. 782, 788 (2014), demanded no less. But the Constitution is "intended to preserve practical and substantial rights, not maintain theories." Davis v. Mills, 194 U.S. 451, 457 (1903). The "special privileges" of "inherent sovereign authority" for Ms. Johnson resulted in no bail, a long stay in jail while undergoing cancer treatment, no lawyer, and no discovery.

The Government's responsive pleading to our Motion to Dismiss suggests the "facts squarely contradict her claim of improper collusion between tribal and federal authorities." Docket Entry 145, at p. 15. We disagree.

This case was hardly a matter of routine cooperation between the law enforcement entities. No deference would be due to sovereignty. The F.B.I. Agent knew full well what was to occur, and the deficiencies of the local court, for no other reason than limited sentences available. "I just don't think it's a tribal matter at this point because of the tribal system," T. 102, he told Ms. Johnson. He was right.

The law is changing. A progression quite clear from our viewpoint. Three years ago, Tribal Court jurisdiction was deemed exclusive of state court venue, for

crimes occurring on the Reservation. See McGirt v. Oklahoma, 140 S.Ct. 2452, 2478 (2020). McGirt noted the legal efficacy of Public Law 280. Id. at 2478.

Disputing McGirt's central tenant, Oklahoma v. Castro-Huerta, 142 S.Ct. 2486 (2022), held that federal and state courts have concurrent jurisdiction over major crimes on the reservation. Castro-Huerta's facts were arguably limited to a non-Indian defendant committing a crime against an Indian, but the opinion went beyond that difference, holding that "Indian Country is part of a State, not separate from a State." Id. at 2502. The opinion thus changed the McGirt interpretation of Public Law 280, which governs what we do here in Minnesota, with this sentence: "Nothing in the language or legislative history of Pub.L. 280 indicates that it was meant to divest States of pre-existing and otherwise lawfully assumed jurisdiction." Id. at 2499-500. That sentence was not limned to just Oklahoma, and this Court's earlier reading is, with all due respect, too narrow. Compare Lussier, Report and Recommendation at p. 25, n. 21. As Justice Gorsuch noted in his Castro-Huerta dissent, Indian Reservations no longer have "tribal self-government." Id. at 2526. Accepting his reading of the law, the Tribes are no longer sovereign.

And then came Haaland v. Brackeen, 994 F.3d 249 (5th Cir. 2021), which addressed the question we raise, whether the equal protection clause is violated with an Indian is treated differently than a non-Indian, where the state jurisdiction

required greater due process than does the Tribal Court. See Justice Duncan's dissent, Id. at 396. The High Court did not reach the issue, though it was noted for another day in Justice Kavanaugh's concurrence. Brackeen v. Haaland, 144 S.Ct. 1609, 1661-62 (2023). Ms. Johnson's equal protection argument is ripe for review. She has not been foreclosed from raising this claim, and we disagree with this Court's position that she has been. Lussier, Report and Recommendation, at p. 25 (finding no equal protection in the treatment differentials between court systems).

No rebuttal was offered to Mr. Van Wert's testimony, that Ms. Johnson was unfairly denied all the protections that a white defendant would have enjoyed in the state or federal court – bail, discovery, speedy trial, due process. T. 36. The F.B.I. followed the proceedings in Tribal Court, T. 101, and did nothing to correct its unfairness.

This case isn't just about typical coordination between law enforcement entities. There is no detachment here, no boundary established between tribal and federal, no conversation occurred that your jurisdiction is not mine on the same facts. The D.O.J., by AUSA Provinzino, was aware of the alleged crime right after it was discovered, aware of Ms. Johnson's interview and arrest; aware, per Agent Nilson's opinion, shared by the Grand Jury, that prosecution would be forthcoming; aware, too, via the F.B.I., of what was happening in the Tribal Court, the continuances, the

stalling, Ms. Johnson's cancer treatment, her needless, almost half-year incarceration.

We're asking for our own sea change on Red Lake. That this Court rule, in this case, the Government created two classes on defendants. One class features Ms. Johnson a Native American sent to Red Lake Court and denied due process of law. The other class includes the defendant, perhaps Caucasian, perhaps Black, perhaps Asian, who, for the same charges, would have been brought to the Beltrami County District Court, be appointed a licensed public defender free of charge, and a prompt presentment. Rules 5.01 and 8.01, Minn.R. Crim.P. Or be charged by Complaint in the United States District Court and receive like protections. One class sits in jail, ill. The other is released. One class receives due process, the other does not.

The United States opines that, for a remedy, Ms. Johnson could have filed a habeas corpus petition, filed under 25 U.S.C. 1303 citing Stanko v. Oglala Sioux Tribe, 916 F.3d 694, 697 (8th Cir. 2019), Docket Entry 145 at p. 16. No mention is made that Ms. Johnson could have done that. Mr. Van Wert wasn't licensed in federal court. She had no other lawyer, and there is no right to counsel in habeas cases anyway. 18 U.S.C. 2006A(a)(2)(B).

What happened to Ms. Johnson falls within a sad progression. The Native

American has, for centuries, been mistreated. The literature is conclusive, from Dee Brown's Bury My Heart and Wounded Knee (Henry Holt 1970) to Ned Blackhawk's The Rediscovery of America (Yale 2022), the Government's marginalization of the Indian is recounted over and over again. Ms. Johnson was enveloped into a long and sad perfidy.

The case law has held out the possibility the courts "may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32 (1973). A denial of "fundamental fairness" gets us to that ridge. Id. at 432. The phrase "shocking to the conscience" tells us what "outrageous" is supposed to mean. Rochin v. California, 342 U.S. 165, 172 (1952).

What happens in the Red Lake Tribal Court has been hushed. The gloss, the sheen, dim patina that all is well, covers deplorable lack of due process, a deep and insidious prejudice, a denial of equal protection. It's a shame, a crying shame. If this Court does nothing, it just goes on.

**Motions to Suppress**

The initial question is whether Ms. Johnson was in custody on May 3, 2022, at the F.B.I. field office. Despite the Agent's suggestion that Ms. Johnson was free

to leave the interview, she was not.

A formal arrest is unnecessary for a finding of custodial interrogation.

The factors to consider are 1) whether Ms. Johnson was informed she was free to leave; 2) whether she in fact had freedom of movement; 3) whether she initiated the contact with the FBI or "voluntarily acquiesced;" 4) whether strong-arm tactics or like tactics were employed; 5) whether the atmosphere was police dominated; and 6) whether Ms. Johnson was placed under arrested "at the end of questioning." United States v. Elzahabi, 557 F.3d 879. 883 (8th Cir. 2009)(citing United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). The six factors are not exclusive, for custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Id. (quoting United States v. Czichray, 378 F.3d 822, 827-28 (8th Cir. 2003)).

Surely the interview in Bemidji was police dominated, with the FBI Agent and Red Lake Investigator questioning Ms. Johnson, who herself had no experience in this arena. She did not initiate the interview. The key inquiry of the six is whether Ms. Johnson's "freedom to depart was restricted in any way." Id. at 884 (citing United States v. LeBrum, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting in turn Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Agent Nilson's promise that Ms. Johnson was free to leave would have had weight if true. United States v.

Sanchez, 676 F.3d 627, 631 (8th Cir. 2012).

His promise, it turned out, was phony. Ms. Johnson was formally arrested at her home on the Red Lake Reservation. She was brought there in Agent Nilson's car, so as to restrict her from walking away. She never could leave.

The Agent admitted to abundant probable cause to keep Ms. Johnson; hers was not a close call. T. 70. The Agent's demurral – the thought he had nothing to do with the arrest – does not erase the arrest itself. T. 61. The Government is not permitted to infer (and then argue), as Agent Nilson did in testimony, that the decision to arrest was not his own. That this Court should ignore the cuffs applied to Ms. Johnson's wrists because he had not done so.

Under the doctrine of "collective knowledge," this Court must "presume the officers have shared relevant information which informs the decision to seize evidence or to detain a particular person . . ." United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988)(citing United States v. Wright, 641 F.3d 602, 606 (8th Cir.), cert. denied, 451 U.S. 1021 (1981), cert. denied, 488 U.S. 1011 (1989)). By this doctrine, Agent Nilson's claim of being unaware of the impeding arrest and its fruition is to be discounted. The knowledge of the Red Lake Police was imputed onto his gestalt.

The most important of the six Griffin factors – the arrest at the conclusion of

the interview – favors Ms. Johnson's claim of custodial interrogation, admittedly secured sans Miranda warning. T. 57-58.

The interview was also involuntary. Coercive law enforcement conduct is the predicate for this claim. Colorado v. Connolly, 479 U.S. 157 (1986). Recent scholarship has taken a long view at voluntariness, discerning a number of factors to consider, including the defendant's isolation and the power differential involved between the questioner and subject. J. Kaplan et al., "Evaluating Coercion in Suspect Interviews and Interrogations," Advances in Psychology and Law 1-40 and note 27 (2019). Additional voluntariness factors include the location of the questioning, Miranda v. Arizona, 384 U.S. 436, 457-58 (1966), whether, as noted, a Miranda warning was not given, United States v. Morgan, 729 F.3d 1086, 1091-92 (8th Cir. 2014) and United States v. Aguilar, 384 F.3d 520, 525 (8th Cir. 2004); whether Ms. Johnson initiated contact (which she did not) coupled with her lack of experience in the criminal justice system (minimal), Gray v. Norman, 739 F.3d 1112, 1116-17 (8th Cir. 2014). Compared to the sophistication of her interviewers, Ms. Johnson was hapless, and her voluntariness rooted in the sense that she could leave at any time. In the end, she could not.

Ms. Johnson's consent to search her home, Exh. 4; T. 64, was under the same misleading pretense, namely that she was free to go anytime when she signed. Her

consent is to be judged upon the totality of circumstances, Schneckloth v. Bustamonte, 412 U.S. 218, 242-43 (1973), which includes "both the characteristics of the accused and the details of the interrogation." Id. at 226. And whether the precursor questioning, as here, was "prolonged." Id. All the "surrounding circumstances" of Ms. Johnson's consent must undergo "careful scrutiny." Id. At the very least, Agent Nilson should have told Ms. Johnson that, once she signed the consent form, she'd be arrested. He decided to mislead her by unfair omission.

This leaves us with the jail interview of May 5th, which was Mirandized. Exh. 7. Not satisfied with his 113 pages of transcript generated from the May 3rd dialogue, Agent Nilson returned to the Red Lake Jail two days later, while she was in custody on tribal charges to be filed the next day. Ms. Johnson signed a Miranda waiver, but that is not determinative.

The second statement was the product of undue delay in her presentment. We appreciate the federal court's right of presentment, requiring the defendant within six hours of arrest to appear before Magistrate Judge, Corley v. United States, 556 U.S. 303 (2009), has not been extended to the Tribal Court. United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994). Ms. Johnson was not arrested for a federal offense, notes United States v. Pugh, 25 F.3d 669, 674 (8th Cir. 1994). Yet she was subsequently indicted by a federal grand jury for the exact same conduct.

Agent Nilson's consultations with AUSA Provinzino were not the subject of idle chatter. He wanted more than five years in prison for Ms. Johnson, and he knew he couldn't get that amount of time in the Tribal Court setting. T. 97. And he knew what was about to occur, taking advantage of a delay in Red Lake formal charges (filed the next day) to secure a second confession.

We persist in raising the presentment claim because the use of the Red Lake Tribal Court as a holding cell for federal defendants awaiting certain indictment violates 25 U.S.C. 1302(A)(6) and (7) of the Indian Civil Rights Act. Specifically, the practice employed here denied not only Ms. Johnson's Fifth Amendment right of due process, but the identical due process preserved for her under the Indian Civil Rights Act. See 25 U.S.C. 1302(D)(8). We state the obvious that, had Ms. Johnson not been an Indian, she would not have been placed in the Red Lake Jail.

What this Court has held in the past – that there is no presentment right and that the cases, federal and Red Lake, are distinct, would be, with all due respect, an error in our context. Compare Lussier, Report and Recommendation, at p. 19-21. Where the investigations are joined, where the Tribal Court prosecutor is aware, recalled Mr. Van Wert, that the F.B.I. was the "primary focus of the investigation they were conducting," T. 36, and where an indictment was predicted with certainty, T. 86, standing back and concluding the Red Lake Tribal Court practices are good

enough when due process protections are available in a fair venue would be a rather awful ruling to make. "29" hours was too long a wait in Corely. Id. at 312. More than two days Ms. Johnson sat.

Ms. Johnson's second signed consent, Exh. 8, to search her phone is moot. Agent Nilson decided on a warrant. T. 77. Exh. 9 was signed by Magistrate Judge Jon T. Huseby on August 5, 2022. Probable cause came from Ms. Johnson's second interview at the Red Lake Jail. Affidavit paras. 11, 12, 13, 14, 15, 16, 17, and 18. Paragraph 16 indicates that Ms. Johnson used her phone to film the alleged abuse.

For a four corners challenge like ours, the question is whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place," Illinois v. Gates, 462 U.S. 213, 238 (1983), to wit: her cell phone. The "totality of circumstances" is of course considered. United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted). Deference is due to the discretion of the signing jurist. Gates, 462 U.S. at 236; United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009).

Still, a "fair probability" that evidence of assault and torture would be discovered on her phone had to have been shown. United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009). In other words, a nexus must have existed between

the cell phone, to be searched and the evidence suspected to be there. United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000); Rule 41(c), Fed.R.Crim.P.

There had to have been a "substantial basis" of probable cause within the affidavit, Gates, 462 U.S. at 238-39, which is lacking. This warrant is based upon statements obtained by lack of timely presentment. Without her statements, the warrant lacks a connection, or nexus, to the alleged crime.

A second warrant, Exh. 10, is for the search and seizure of Ms. Johnson's Facebook data, Bates 1571, signed by Magistrate Tony N. Leung on November 4, 2022. This warrant's affidavit begins with a word-for-word copy of the cell phone search warrant affidavit. The additional information concerns data, since discovered on her cell phone, including "chat excerpts recovered from the Facebook Messenger application," and references, in those chats, to the alleged victim and "the source of his injuries." Para. 18. The select number of Ms. Johnson's messages are quoted. Paras. 19, 20, 21, 22, and 23.

This second search warrant is tainted by the illegality of the first. Take away Ms. Johnson's statements, and there is no basis to search.

The Good Faith Doctrine permits this Court to avoid even deciding the probable cause predicate. United States v. Leon, 468 U.S. 897, 916 (1984). United States v. Washington, 455 F.3d 824, 828 (8th Cir. 2006). Without the

statements of Ms. Johnson, the affidavit becomes, though, an empty vessel, "so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975)(Powell, J., concurring in part). It becomes the bare bones, and exception. Id. at 923, n. 24.

**Motion to Strike Surplusage**

We reserved briefing. T. 10. The Government claims the Indictment's language is "not overly inflammatory." Docket Entry 145, at p. 7 and n. 1. It is. The listing of the victim's injuries is not necessary to the elements. Para. 4. There is no longer a need "to outline the relationships between the various defendants and the victim," Id. at 6, because two of the defendants, Bertram Calvin Lussier and Patricia Ann Johnson, are no longer part of the case. Docket Entries 169, 170.

Dated: October 2, 2023

Respectfully submitted,

*/s/ Paul Engh*
PAUL ENGH, Lic. 134685
150 South Fifth Street, Suite 2860
Minneapolis, MN 55402
612.252.1100
engh4@aol.com

Lawyer for Ms. Johnson